Argued and submitted December 11, 1981, reversed and remanded for a new trial May 26, reconsideration denied July 8, petition for review denied July 27, 1982 (293 Or 394)

# CITY OF MEDFORD,
## *Appellant,*
### *v.*
# HERBISON, dba Federal Automatic Alarms et al,
### *Respondents.*

## (No. 79-3617, CA A21151)

645 P2d 563

William J. Scheiderich, Assistant City Attorney, Medford, argued the cause and filed the brief for appellant.

Richard A. Stark, Medford, argued the cause for respondent. With him on the brief was Haviland and Stark, Medford.

Before Gillette, Presiding Judge, and Young, Judge, and Roberts, Judge Pro Tempore.

GILLETTE, P. J.

## GILLETTE, P. J.

The City of Medford (City) brought this action against defendant and his surety for accrued civil penalties for false burglar alarms. The penalties were assessed against defendant under a City ordinance. The trial court directed a verdict for defendant, ruling that there was insufficient evidence to bring defendant within the scope of the ordinance and that the ordinance violated the Equal Protection Clause.[1] The City appeals. We reverse.

Defendant owns a Medford alarm company which is licensed under a city ordinance. He installs, services and repairs holdup and burglar alarms. In 1974, he volunteered to install a burglar alarm panel in the dispatch center of the City's police station. The panel displays 150 lights; each is connected through leased telephone lines to private burglar alarms throughout the city. When one of these alarms is activated, a display light on the panel begins blinking and alerts the police, who then investigate. Under defendant's agreement with the City, any interested individual alarm user or other alarm company that wished to display signals from their alarms could purchase a place on the panel by paying defendant a one-time fee. The fee included installation and the cost of a module that converts the user's alarm signal to the flashing light. Throughout the period relevant here, 112 of the 150 lights were in use. Seventy-two were connected to users with whom defendant maintained a service relationship; the other 40 spaces were sold to 23 private users who either serviced their alarm system themselves or employed another alarm company to do so. Defendant disavows any business relationship with these 40 beyond the initial sale of space on the panel.[2]

Many things besides break-ins will trigger a burglar alarm—the most frequent cause of false alarms is

[1] Oregon citizens are guaranteed equal protection of the law by the Fourteenth Amendment of the United States Constitution and by Article I, Section 20, of the Oregon Constitution. The parties have treated the state and federal Equal Protection Clauses as co-extensive, and we do likewise. *See Olsen v. State ex rel Johnson,* 276 Or 9, 16-17, 554 P2d 139 (1976).

[2] Apart from the panel, other alarms are reported to the dispatch center by telephone call from alarm companies which have their own arrangement to alert the police when a customer's alarm goes off, or from a bystander who hears an audible alarm sounding.

employe error, but there are others—and false alarms have become a problem for the City. As a result, in 1976, the City enacted an ordinance[3] designed to reduce the number

---

[3] The provision was added on August 23, 1976, by Ordinance No. 2652. It created Section 8-590 of the Medford City Code, providing:

"*False Alarms: Civil Penalty.*

"(1) As used in this section, the following definitions shall apply:

"(a) '*Alarm*' means any mechanical or electrial device or assembly of equipment, designed or arranged to signal the occurrence of an illegal entry or other activity requiring urgent attention and to which the police are expected to respond.

"(b) '*Alarm Company*' means any firm, person, partnership, or corporation required to be licensed under Section 8-505 hereof, which, with respect to any alarm installed upon any premises within the city, has servicing, maintenance, or monitoring duties or responsibilities under the terms of any agreement or arrangement with an alarm user.

"(c) '*Alarm User*' means any person, firm, partnership, or corporation of any kind in control of any building, premises, structure or facility upon which an alarm is maintained.

"(d) '*False Alarm*' means an alarm signal to which the city police respond with any emergency service personnel or equipment when a situation requiring a response by the police does not in fact exist, and which signal is caused by the inadvertence, negligence, or intentional act or omission of an alarm company or alarm user, or a malfunction of the alarm. The following shall not be considered false alarms:

"(1) Alarms caused by the testing, repair or malfunction of telephone equipment or lines.

"(2) Alarms caused by an act of God, including earthquakes, floods, windstorms, thunder or lightening.

"(3) Alarms caused by an attempted illegal entry of which there is visible evidence.

"(4) Alarms caused by the testing, repair, or malfunction of electrial utility equipment or lines.

"(2) The city council finds that a significant investment of time and manpower has been and is required by the city police department in responding to false alarms. The city council further finds that alarm companies are in a superior position to significantly reduce the instances of false alarms through proper installation, servicing and maintenance of alarms and through education and instruction of alarm users and employees of alarm users.

"(3) A civil fine in the amount of $10.00 shall be assessed against the responsible alarm company for each false alarm. The Director of Finance of the City, or his designate, shall notify alarm companies of any fine imposed thereunder. Failure of the alarm company to pay the fine within thirty days from the date of receiving notice thereof may result in revocation or suspension of the license issued under Section 8-505 hereof, in accordance with the provisions of Section 8-545."

of false alarms. The ordinance provides that, with certain exceptions irrelevant here, a $10 civil fine be assessed against the "alarm company" responsible for each false alarm to which the police respond, whether caused by inadvertence or fault of the alarm company or the user or by malfunction of the alarm. The rationale for holding the alarm company responsible is that the company is in a better position to reduce the instances of false alarms through proper maintenance of alarms and proper instruction to users. Subsection (1)(b) of the ordinance defines "Alarm Company" as

> "* * * any firm, person, partnership, or corporation required to be licensed under Section 8-505 hereof, which, with respect to any alarm installed upon any premises within the city, has servicing, maintenance, or monitoring duties or responsibilities under the terms of any agreement or arrangement with an alarm user."

The ordinance became effective in October, 1976, and between that date and October 1, 1979, the City billed defendant for each false alarm which was reported on the panel, for a total penalty of $16,880. Defendant did not pay; the City then brought this action.

■    In its first assignment of error, the City contends that the trial court erred in directing a verdict for defendant on the ground that there was insufficient evidence for the jury to find defendant to be an "alarm company" within the meaning of the ordinance, *i.e.,* that there was insufficient evidence that defendant had "servicing, maintenance, or monitoring duties or responsibilities under the terms of any agreement or arrangement with an alarm user." A directed verdict is proper only if an allegation is not supported by any substantial evidence; the court is not to weigh conflicting evidence or evaluate credibility. *Hansen v. Bussman,* 274 Or 757, 763, 549 P2d 1265 (1976). Here the City seeks to recover the $10 fine from defendant for false alarms originating from any of the 112 alarms connected to the panel. The evidence at trial showed that, as to 40 of the alarms involving 23 individual users, defendant's only responsibility was the initial installation of the module. These users either serviced their own alarm or employed another alarm company to do so. One self-servicing user testified that it had no arrangement with defendant to

maintain, repair, or monitor its alarm; instead, its employes did all such work themselves, including the instruction of other employes in the proper use of the alarm. That user further testified that, if there is a malfunction of the module itself, there is no prearrangement that defendant repair it; rather, the user could arrange for defendant or any other alarm company to do the work. An employe for an alarm company testified that his company had a maintenance agreement with some of the alarm users connected to the panel, but that it was not billed for these users' false alarms. He also testified that his users have no service arrangement with defendant. If there were problems in the display panel, he would call defendant for assistance, but there were virtually no problems.

■     The City offered no direct evidence to show that defendant had a service relationship with any of these 23 users. It argues instead that defendant's maintenance responsibilities as to the panel itself, the fact that the module is an integral part of each alarm system and the fact that defendant informed all users that he would bill them for any fines charged to him because of a false alarm originating on their premises creates a jury question as to whether defendant comes within the ordinance. We agree. The alarm systems included the board, for which defendant was responsible. A jury could reasonably find defendant's activity constituted service and maintenance under the ordinance.

■     It was also error to direct a verdict as to the fines for alarms from the 72 users who were "serviced by" defendant, according to a letter he wrote to the City on September 24, 1979. The letter itself is substantial evidence from which a jury could determine that defendant came within the ordinance.

■ ■     In its third[4] assignment, the City contends that the court erred in holding that the ordinance violates the Equal Protection Clause in that it does not apply civil penalties if a false alarm originates with a user who does not have a service arrangement with a licensed alarm company, thus improperly singling out licensed alarm companies. The

---

[4] Because of the way in which we resolve defendant's constitutional defenses, the City's second assignment of error is moot.

criticism here is one of underinclusion: in attacking a general problem (false alarms), the ordinance does not penalize all who contribute to it. In such cases, courts have traditionally been very reluctant to strike down a legislative classification. As the Supreme Court stated in *McDonald v. Board of Election,* 394 US 802, 809, 89 S Ct 1404, 22 L Ed 2d 739 (1969):

> "A legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked."

*See also Duerst v. Limbocker,* 269 Or 252, 259, 525 P2d 99 (1974). Accordingly, a non-suspect classification will be upheld if there is any rational basis to justify it. *See Williamson v. Lee Optical Co.,* 348 US 483, 489, 75 S Ct 461, 99 L Ed 563 (1955). Here, it is enough to say that the City might have determined that individual users, unlike alarm companies, have neither the knowledge nor resources to work to reduce the number of false alarms caused by employe or equipment error. The ordinance may have been limited to *licensed* companies in order clearly to distinguish an alarm business from a private user and/or because the City assumed that all alarm companies operating within the city would comply with its licensing requirement. Such considerations would be sufficient to justify the classification; this ordinance does not violate the Equal Protection Clause.[5]

Reversed and remanded for a new trial.

---

[5] Defendant contends that the ordinance violates other constitutional and statutory requirements, but these arguments do not require discussion.