Argued and submitted March 22, affirmed September 26, 2007

Deborah MARCUM,
*Plaintiff-Appellant,*

*v.*

ADVENTIST HEALTH SYSTEM/WEST,
a foreign corporation,
dba Adventist Health;
Northwest Medical Foundation of Tillamook,
an Oregon corporation,
dba Tillamook County General Hospital;
Alliance Imaging, Inc.,
a foreign corporation;
Alliance Imaging Management, Inc.,
a foreign corporation;
and Alliance Imaging Centers, Inc.,
a foreign corporation,
*Defendants-Respondents.*

Multnomah County Circuit Court
040505205; A129660

168 P3d 1214

Jeffrey B. Wihtol argued the cause and filed the briefs for appellant.

Janet M. Schroer argued the cause for respondents Adventist Health System/West and Northwest Medical Foundation of Tillamook. With her on the brief was Marjorie A. Speirs.

Lisa E. Lear argued the cause for respondents Alliance Imaging, Inc., Alliance Imaging Management, Inc., and Alliance Imaging Centers, Inc. With her on the brief were R. Daniel Lindahl, David R. Foster, and Bullivant Houser Bailey PC.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

Armstrong, J., concurring in part, dissenting in part.

## HASELTON, P. J.

Plaintiff appeals in this case involving claims of medical negligence, informed consent, and "spoliation" of relevant documents. The court directed verdicts in defendants'[1] favor on all claims. Plaintiff appeals, arguing that the trial court erred in excluding her scientific evidence of medical causation. *See State v. O'Key*, 321 Or 285, 899 P2d 663 (1995); *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). In addition, with respect to her informed consent and negligent spoliation claims, plaintiff asserts that the trial court erred in directing verdicts in defendants' favor on those claims and in excluding evidence pertaining to the spoliation claim. We affirm.

■■ We review the exclusion of scientific evidence under *Brown* and *O'Key* for errors of law. *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 301, 14 P3d 596 (2000). In reviewing the directed verdicts, "we view the evidence in the light most favorable to plaintiff and extend to [her] the benefit of every reasonable inference that could be drawn from the evidence." *Harris v. Pameco Corp.*, 170 Or App 164, 166, 12 P3d 524 (2000). The court "is not to weigh conflicting evidence or evaluate credibility." *City of Medford v. Herbison*, 57 Or App 496, 500, 645 P2d 563, *rev den*, 293 Or 394 (1982). A directed verdict is appropriate only if the moving party is entitled to judgment as a matter of law. *Lindstrand v. Transamerica Title Ins. Co.*, 127 Or App 693, 695, 874 P2d 82 (1994).

The following facts are uncontroverted unless otherwise noted. In March 2003, after plaintiff was involved in an auto accident, suffering a possible head injury, her doctor ordered an MRI. Plaintiff went to Tillamook County General Hospital and was escorted to an MRI trailer just outside. The MRI technologist, employed by Alliance, informed plaintiff

---

[1] The defendants in this case are Adventist Health System/West, Northwest Medical Foundation of Tillamook, dba Tillamook County General Hospital, Alliance Imaging, Inc., Alliance Imaging Management, Inc., and Alliance Imaging Centers, Inc. We refer to all defendants collectively as "defendants." When necessary, we refer to defendants Adventist Health System/West and Northwest Medical Foundation of Tillamook, dba Tillamook County General Hospital, collectively, as "the hospital," and to defendants Alliance Imaging, Inc., Alliance Imaging Management, Inc., and Alliance Imaging Centers, Inc., collectively, as "Alliance."

that he would be injecting her with a contrast chemical, gadolinium, used to enhance the MRI image.

Alliance's MRI technologists are trained to advise patients that, if the injection of a contrast chemical causes pain or any other discomfort, they should immediately inform the technologist. If a patient makes such a complaint, the technologists are trained to check for extravasation. "Extravasation" occurs when a substance exits the vein and enters the surrounding tissue. *See Stedman's Medical Dictionary* 635 (27th ed 2000) (defining "extravasate" as, *inter alia*, "[t]o exude from or pass out of a vessel into the tissues"). The general standard of care applicable to MRI technologists requires that they explain the procedure to the patient and ask the patient to inform them if they feel pain. However, neither plaintiff's technologist nor her treating physician explained the injection procedure, asked her to report pain, or explained to her any risks associated with the injection.

After attempting the injection on each of plaintiff's arms unsuccessfully, the technologist attempted to make the injection on the back of plaintiff's left hand. Immediately after the needle went into her hand, plaintiff complained that her hand felt "like a glove filling up." She explained to the technologist that "if he was to take the tip of my fingers off he would see the stuff running on the floor. That's how full it felt." The technologist acknowledged plaintiff's complaint but told her it would be okay and finished the procedure.

Plaintiff manages a restaurant. She normally performs various functions in the business, including food preparation, which involves going to the restaurant's walk-in refrigerator. The day after the MRI, however, when she went to the walk-in refrigerator she had a difficult time handling the cold food and complained that her left hand hurt. Her coworker described her hand as appearing purple, orange, and swollen. After a couple of hours, plaintiff went to the emergency room. She has experienced pain ever since, which has impaired her ability to work. Plaintiff's hand has remained discolored near where she received the gadolinium injection.

The MRI technologist created an incident report the day after the MRI. The original report has not been located; however, plaintiff obtained a copy of that report that is incomplete. The bottom of the form states that the information continues on the next page, but the next page is missing. A blank copy of the form shows that the second page requests information about the technologist making the report and allows for additional comments. Neither the incident report nor any other records disclose the amount of contrast used in plaintiff's injection or whether her informed consent was obtained.

Plaintiff filed this action against defendants. In her operative complaint, she alleged that defendants had negligently injured her and negligently failed to obtain her informed consent before injecting her with gadolinium. In addition, plaintiff alleged "negligent spoliation" of evidence with regard to three classes of documents: documents indicating the specific chemicals and amounts ordered and used in the injection; the complete incident report filed after she complained of pain at the injection site; and documents recording the details of the MRI procedure, including a patient worksheet, screening form, and consent form for the procedure. Plaintiff alleged that defendants lost or destroyed each of those documents and that, due to their absence, "plaintiff has suffered an impairment of her ability to prevail in this lawsuit."

As amplified below, at trial, the court excluded portions of the testimony of plaintiff's two expert witnesses, Dr. Weldon Williamson and Karen Marburger. Williamson, a medical doctor specializing in hand disorders, would have testified concerning medical causation. Marburger, an MRI technologist, would have testified that defendants should have made and kept various records and that, had plaintiff been able to obtain those records, they might have been beneficial in proving plaintiff's claims.

With respect to Williamson's testimony, the court held an OEC 104 hearing to determine whether Williamson's opinion regarding causation—specifically that gadolinium extravasation caused plaintiff's Raynaud's syndrome—was "scientifically valid" under the standards prescribed in

*Brown* and *O'Key*. The court ultimately concluded that that testimony did not satisfy the requisites of foundational admissibility. The court excluded portions of Marburger's testimony as "speculative."

Defendants moved for a directed verdict on plaintiff's medical negligence claim based on plaintiff's failure to produce evidence of causation. Plaintiff, while maintaining that the exclusion of Williamson's testimony was error, agreed that without that testimony, she had not produced evidence of causation. Defendants also moved for directed verdicts on plaintiff's informed consent and negligent spoliation claims. The court directed a verdict in defendants' favor on all three claims and entered judgment accordingly.

Plaintiff appeals. She assigns error to the exclusion of Williamson's testimony regarding causation, to the exclusion of Marburger's testimony regarding her spoliation claim, and to the allowance of the directed verdicts on the informed consent and spoliation claims.

■ In her first assignment of error, plaintiff contends that the trial court erred in excluding Williamson's testimony. As a preliminary matter, defendants argue that that assignment of error is not reviewable because plaintiff did not also assign error to the subsequent allowance of the directed verdict against the medical negligence claim. For purposes of our review in this context, that is a distinction without a difference.

Plaintiff, of course, vigorously disputed, and objected to, the court's exclusion of Williamson's testimony regarding the causation and permanency of her injury. Plaintiff candidly acknowledged that that evidence was essential to her medical negligence claim—*i.e.*, without it, defendants would be entitled to a directed verdict on that claim. On appeal, plaintiff properly assigns error only to the evidentiary ruling. The failure to also assign error to the allowance of the directed verdict was not somehow preclusive; the latter was entirely derivative of the former. Indeed, given the court's predicate evidentiary ruling, the allowance of the directed verdict was not erroneous, because there was no evidence of medical causation before the jury. *See, e.g., Shockey v. City of Portland,* 313 Or 414, 422-23, 423 n 6, 837 P2d 505 (1992)

("In determining whether the trial court erred in entering a directed verdict for [the] defendants, we view the evidence in the light most favorable to the non-moving party * * * and extend to that party the benefit of every reasonable inference that may be drawn from the evidence"; "evidence" for purposes of that review is the evidence "not excluded" by the trial court).[2] We proceed, then, to the merits of that assignment of error.

Williamson first examined plaintiff on September 15, 2003, approximately six months after the MRI. He is a vascular surgeon who is on the academic faculty at Oregon Health and Science University (OHSU). His research and teaching focus on vascular surgery and artery problems. He was a member of a team at OHSU that received funding from the National Institutes of Health to study the effects of various chemicals on blood vessels. That team has produced "[t]he largest volume of research literally in the world * * * for arteries [and] problems in the fingers." Williamson himself has published approximately 30 articles and book chapters, several of which address vascular problems in the hands. At least one of his published works deals specifically with methods of diagnosing the "causes of vascular compromise in the hand and fingers."

Williamson has done specific research on a condition known as "Raynaud's syndrome," a "vasospastic disorder."[3] Williamson explained a vasospasm as follows:

---

[2] Defendants rely on *Holien v. Sears, Roebuck and Co.*, 66 Or App 911, 677 P2d 704, *aff'd*, 298 Or 76, 689 P2d 1292 (1984), to support their position. That case is inapposite. There, the trial court, acting as factfinder on liability, rejected the plaintiff's claim for statutory employment discrimination. The plaintiff did not assign error to that determination but, instead, assigned error to a preliminary ruling to strike general damages from that claim. We held that the plaintiff's failure to assign error to the determination on the merits of her statutory claim rendered any error regarding the potential availability of general damages on such a claim "moot." *Id.* at 915.

[3] Williamson explained that different physicians might mean different things when speaking of "Raynaud's syndrome." Because of that, he explained that, although he referred to plaintiff's condition as Raynaud's syndrome, it is most accurate to simply describe plaintiff's condition as a vasospastic disorder. For convenience, when we use the term "Raynaud's syndrome," we use it to describe the particular vasospastic disorder Williamson diagnosed in plaintiff.

"If you can visualize an artery as just a regular tube, it's made up of muscle cells and other tissues, and an artery that is in a condition of vasospasm has clamped down, sometimes to the point where there's no blood flow going through it, at all."

With Raynaud's syndrome, the arteries experience a vasospasm, *i.e.*, they "clamp[ ] down abnormally in response to cold exposure."

When Williamson first met plaintiff, he performed a physical examination and took a case history, both of which were specific to his specialty and to her complaints. Plaintiff told Williamson that she had never had similar symptoms in the past, but that, instead, her symptoms began "immediately around the time that she received an MRI scan [when] an IV was placed in the back of her hand * * *."[4] She described the sensation she felt when the gadolinium was injected into her hand. She also stated that her symptoms were limited to her left hand.

As Williamson learned more about plaintiff's condition, he ordered blood tests and performed more detailed and specific diagnostic tests. He then attempted to rule out the various potential causes of plaintiff's symptoms. After collecting that information, Williamson diagnosed plaintiff with Raynaud's syndrome in the left hand.

Before allowing Williamson to state his ultimate opinion as to the *cause* of that condition, the trial court held an OEC 104 hearing outside the presence of the jury. During that hearing, Williamson testified to his opinion that (1) extravasation occurred during the injection of gadolinium; (2) that extravasation "is connected to [the] vasospastic disorder in the digital arteries of [plaintiff's] left hand," *i.e.*, that gadolinium extravasation caused plaintiff's onset of Raynaud's syndrome; and (3) plaintiff's condition is permanent.

---

[4] Defendants dispute plaintiff's account in that regard. Specifically, defendants assert that plaintiff had hand symptoms before the MRI and that the onset of her new symptoms may not have been immediate. However, given our standard of review, that dispute is immaterial to our determination of the admissibility of Williamson's testimony.

Williamson explained that his conclusion derived from a number of different factors. *First*, he considered the temporal relationship between plaintiff's symptoms and the injection of gadolinium. That is, plaintiff's symptoms began shortly after the injection, and Williamson considered that fact highly relevant.

*Second*, Williamson considered the fact that plaintiff's symptoms arose in only her left hand. In Williamson's view, that fact was "very important" because other known causes of Raynaud's syndrome would have affected both hands.

*Third*, Williamson reviewed "evidence in peer review[ed] journals [indicating] that gadolinium and other related contrasts can be toxic to tissues when * * * presented to the tissues." Specifically, a study performed on mice showed that toxicity can occur when the substance is "outside the blood vessel[,]" as is the case with extravasation. Extravasation will result in the gadolinium "remain[ing] in the body longer than usual * * * in that localized area" and that "the duration of exposure of gadolinium to the tissues is proportional to the degree of toxicity."

*Finally*, Williamson performed a differential diagnosis. Differential diagnosis, or "differential etiology,"[5] involves a process of elimination. After examining plaintiff and conducting numerous tests, Williamson was unable "to point to any other cause."

After "factor[ing] in all of the research that's known about gadolinium and all that [he] know[s] using [his]

---

[5] Differential diagnosis is "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of clinical findings." *Stedman's* at 492. As some federal courts have pointed out, however,

"The more precise but rarely used term is differential etiology, which is 'a term used on occasion by expert witnesses or courts to describe the investigation and reasoning that leads to the determination of external causation, sometimes more specifically described by the witness or court as a process of identifying external causes by a process of elimination.' *See* Mary Sue Henifin et al., *Reference Guide on Medical Testimony*, in *Reference Manual on Scientific Evidence* 439, 481 (Federal Judicial Center, 2d ed. 2000). The etiology of a disease is the cause or origin of the disease[.]"

*McClain v. Metabolife Int'l, Inc.*, 401 F3d 1233, 1252 (11th Cir 2005).

scientific medical methodology for the diagnosis of the cause of digital artery disease," Williamson concluded that "gadolinium was a substantial contributing factor in causing" plaintiff's symptoms.

As part of the offer of proof, Williamson also rendered the opinion that plaintiff's symptoms were permanent. He reached that conclusion by considering plaintiff's continued complaints of symptoms and a continuing "dusky or slight discoloration of the fingers" seen during subsequent visits. Williamson acknowledged that his opinion was based, to some extent, on plaintiff's subjective complaints, but maintained that his observations of visible discoloration were "subtle objective findings" that supported his opinion as to permanency.

During the OEC 104 hearing, Williamson was subjected to extensive cross-examination. On cross-examination, Williamson admitted that there is no medical literature reporting a causal link between gadolinium extravasation and Raynaud's syndrome. In fact, Williamson admitted that no study had ever been done, either by him or anyone else, analyzing gadolinium extravasation and Raynaud's syndrome. However, he explained that the two events occurring is so rare that it would be nearly impossible to conduct such a study.

Defense counsel also questioned Williamson about a study he had relied on in forming his opinion about the cause of plaintiff's injury and, particularly, the potential toxicity of extravasated gadolinium. In that study, researchers injected gadolinium into the hind legs of mice. The researchers found that such injections, at certain volumes, caused necrosis. "Necrosis" is the "[p]athologic death of one or more cells, or of a portion of tissue or organ, resulting from irreversible damage[.]" *Stedman's* at 1185.

On cross-examination, Williamson admitted that necrosis is a different condition than Raynaud's syndrome—and he did not posit any causal connection between necrosis and Raynaud's syndrome. Further, Williamson acknowledged that, because of the weight difference between mice and humans, it is "difficult to have a complete extrapolation of the mice results to human beings." However, he qualified

that admission by explaining that the study "is most valuable, in that [it] show[s] some toxicity or level of toxicity of gadolinium that appears to be proportional to the time of exposure."

The court also questioned Williamson. Specifically, the court asked whether gadolinium extravasation was common, and, if so, why there are not more cases involving symptoms connected to it. Williamson explained that, although extravasation generally is not uncommon, extravasation in the back of the hand is. He theorized that, because the structure of the hand is smaller, injuries arising from extravasation in the hand would be more likely than injuries arising from extravasation in other parts of the body, for instance the upper arm.

Williamson acknowledged that the medical community does not fully understand the cause of Raynaud's syndrome. More specifically, on cross-examination, Williamson admitted that he could not explain the mechanism by which the gadolinium extravasation caused the syndrome to manifest in plaintiff's arteries:

"[DEFENSE COUNSEL]: So [plaintiff] is the first patient that you've treated in your practice that has, in your mind, had an extravasation that has caused Raynaud's syndrome?

"[WILLIAMSON]: Yes.

"[DEFENSE COUNSEL]: *You don't have an explanation regarding the mechanism of how an injection into a vein somehow caused a disease of the arteries, correct?*

"[WILLIAMSON]: *Correct.*

"[DEFENSE COUNSEL]: And, in fact, the cause of Raynaud's syndrome really has yet to be established by the medical community.

"[WILLIAMSON]: That's correct.

"[DEFENSE COUNSEL]: It is still the subject of study.

"[WILLIAMSON]: That's correct."

(Emphasis added.)

At the end of the OEC 104 hearing, defendants objected to the admission of Williamson's testimony regarding causation and permanency. Specifically, with respect to causation, defendants contended that, because Williamson's causation theory—that gadolinium exposure (from extravasation or otherwise) causes Raynaud's syndrome—was not supported by any previous study and because Williamson himself could not explain the mechanism of causation, his opinion regarding causation should be excluded. With respect to permanency, defendants contended that, because Williamson's opinion on permanency was based, in part, on plaintiff's own complaints, that opinion should be excluded as well.

The trial court agreed and excluded the evidence:

"Under *Brown* and *O'Key* * * * when scientific evidence is offered[,] the party offering the evidence has the responsibility to establish that the evidence has a basis in science; in other words, does it possess a reliability in science or the reliability of science. * * *

"Now, in this case, we're focusing on the methods used and applied by Dr. Williamson. I have no question about Dr. Williamson's credentials or his qualifications. I would find that he would be an expert in his field * * *. But I conclude[ ] * * * that the foundation was virtually nonexistent.

"* * * [I]n *Jennings v. Baxter Healthcare*[,] there were just a number of factors in evidence about the way the expert had proceeded with his patient that persuaded the Supreme Court that that was sufficient to go to the jury.

"So we're not focusing on the conclusions of Dr. Williamson, we're focusing on his methodology and the principles that he applied.

"* * * * *

"* * * [A]s I understood Dr. Williamson's testimony, it was essentially [that] he had treated the patient. This was his theory of what caused her complaints and this was his * * * explanation about why he thought the alleged damage was permanent. To me, that satisfied almost none * * * of the *Brown/O'Key* factors, so I found that the testimony did not possess the necessary indicia of scientific validity, notwithstanding Dr. Williamson's impressive credentials."

For the reasons that follow, we conclude that the trial court correctly determined that Williamson's testimony regarding medical causation was not admissible under OEC 702. That rule provides:

> "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

In *Brown*, the Supreme Court explained a court's role in determining whether scientific expert testimony is admissible. The court functions as a "gatekeeper," determining what scientific evidence will be presented at trial. 297 Or at 438. The court does so, generally, in an OEC 104 hearing, by applying OEC 702 in conjunction with the rules governing relevance, including OEC 401[6] and OEC 403.[7] *Id.* at 408; *see also O'Key*, 321 Or at 301 n 18.

When deciding whether to admit scientific evidence, the relevant inquiry is whether the evidence is derived from "scientifically valid" principles. *O'Key*, 321 Or at 301 n 19 ("[S]cientific validity [is] the linchpin of admissibility[.]"). In making that determination, the court is to consider various factors, including,

"(1)  The technique's general acceptance in the field;

"(2)  The expert's qualifications and stature;

"(3)  The use which has been made of the technique;

"(4)  The potential rate of error;

"(5)  The existence of specialized literature;

"(6)  The novelty of the invention; and

---

[6] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[7] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

> "(7)  The extent to which the technique relies on the subjective interpretation of the expert."

*Brown*, 297 Or at 417.[8] Those factors "are guidelines, not a checklist." *State v. St. Hilaire*, 97 Or App 108, 112, 775 P2d 876 (1989). The proponent of the proffered expert testimony (here, plaintiff) bears the burden of proving by a preponderance of the evidence that that evidence satisfies the requisites of "scientifically valid" foundational admissibility. *O'Key*, 321 Or at 303.

■■  Further, as the court stated in *O'Key*:

> "[T]he 'overarching subject' of this multifactor, 'flexible' inquiry 'is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus [of the inquiry] must be solely on principles and methodology, not on the conclusions that they generate.' "

321 Or at 305 (quoting *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 594-95, 113 S Ct 2686, 125 L Ed 2d 469 (1993)) (brackets in original). "As long as the proffered scientific evidence rests on sound scientific reasoning or methodology (*i.e.*, is scientifically valid) and properly can be applied to the facts in issue, it meets the requirements of [OEC] 702, even if the conclusion is novel or controversial." *O'Key*, 321 Or

---

[8] In a footnote, *Brown* offered an expanded list of 11 factors that the court may consider:

  "(1)  The potential error rate in using the technique;

  "(2)  The existence and maintenance of standards governing its use;

  "(3)  Presence of safeguards in the characteristics of the technique;

  "(4)  Analogy to other scientific techniques whose results are admissible;

  "(5)  The extent to which the technique has been accepted by scientists in the field involved;

  "(6)  The nature and breadth of the inference adduced;

  "(7)  The clarity and simplicity with which the technique can be described and its results explained;

  "(8)  The extent to which the basic data are verifiable by the court and jury;

  "(9)  The availability of other experts to test and evaluate the technique;

  "(10)  The probative significance of the evidence in the circumstances of the case; and

  "(11)  The care with which the technique was employed in the case."

*Brown*, 297 Or at 417-18 n 5.

at 302. Thus, the inquiry addresses not only the abstract soundness of the methodology or reasoning employed, but also whether that reasoning or methodology was "properly * * * applied to the facts in issue." *Id.*

We proceed to the application of those principles to Williamson's putative testimony. Williamson's diagnosis involved two parts, only the second of which is at issue on appeal. First, Williamson diagnosed plaintiff with what he termed "Raynaud's syndrome"—and the trial court admitted his testimony as to that diagnosis. Second, Williamson determined that the cause of that condition was the extravasation of gadolinium into plaintiff's hand. The parties' dispute pertains solely to the scientific validity of that opinion concerning causation—specifically, Williamson's application of differential diagnosis.

Differential diagnosis is a generally accepted method of medical inquiry. *See Jennings,* 331 Or at 308. However, like other scientific methods, its "use" must be proper. In the federal courts, "[a] whole sub-body of [FRE 702] law has developed with respect to the reliability, and admissibility, of differential diagnosis." *Clausen v. M/V New Carissa,* 339 F3d 1049, 1057 (9th Cir 2003). Those cases describe the process of differential diagnosis as one of "ruling in" all potential causes of a particular injury and then systematically "ruling out" all but one. *Id.* at 1058. If a scientific expert improperly "rules in" a potential cause—that is, considers a potential cause that is not scientifically capable of causing the alleged injury—the expert's conclusion that that agent caused the injury is unreliable and not scientifically valid. *Id.*; *see also McClain v. Metabolife Int'l, Inc.,* 401 F3d 1233, 1252 (11th Cir 2005) ("[Differential diagnosis] may offer an important component of a valid methodology. This approach, however, will not usually overcome the fundamental failure of laying a scientific groundwork for the general toxicity of the drug and that it can cause the harm a plaintiff suffered.").

In determining the cause of plaintiff's condition, Williamson used differential diagnosis. In initially identifying the universe of potential causes, Williamson included a variety of causes recognized in the medical literature. In

addition, Williamson included gadolinium extravasation as a possible cause. Williamson then "ruled out" all of the other potential causes he had initially identified; he was unable to "point to any other cause." Consequently, he concluded that gadolinium extravasation was the medically probable cause of plaintiff's Raynaud's syndrome.

In deciding to "rule in" gadolinium extravasation, Williamson, as noted, relied on three considerations: (1) the temporal proximity of the injury and the extravasation; (2) the spacial proximity of the injury to the extravasation site; and (3) published medical literature concluding that gadolinium exposure is toxic, can cause necrosis, and becomes increasingly toxic as exposure time endures. Defendants contend that Williamson's inclusion of gadolinium extravasation in the universe of potential causes, and his ultimate identification of gadolinium extravasation as the medically probable cause of plaintiff's Raynaud's syndrome, did not comport with *Brown*'s requirements—and, in fact, transcended *Jennings*, which defendants style as representing "the outer limits" of the admissibility of "scientific evidence."

In *Jennings*, a product liability case, the plaintiff alleged that she had experienced neurological disorders as a result of exposure to silicone leaking from a ruptured breast implant. 331 Or at 288. The plaintiff sought to introduce the testimony of an expert witness, Dr. Grimm, that her neurological symptoms were probably caused by silicone exposure.

Testimony in the OEC 104 hearing established that, although no published study had ever linked silicone to the particular types of neurological problems that the plaintiff was experiencing, Grimm had personally conducted a study of approximately 50 women patients with breast implants who had experienced the same "unique pattern" of symptoms. *Id.* at 289-90. Based on his study, Grimm concluded that, although he did not "understand * * * the mechanism [of causation] yet," it was medically probable that silicone, from the ruptured implants, had caused the patients' neurological symptoms. *Id.* at 291. With respect to the plaintiff's condition, Grimm employed differential diagnosis and, given the results of his patient study, "ruled in" silicone exposure as

a potential cause. Grimm then "ruled out" other potential causes and concluded that the plaintiff's condition was probably caused by silicone. *Id.* at 308.

Following the OEC 104 hearing, the trial court excluded Grimm's testimony concerning causation. *See* 331 Or at 294-98. The jury ultimately returned a verdict for the defendants. On appeal, we reversed, concluding that the trial court had erred in excluding Grimm's testimony on causation. *Jennings v. Baxter Healthcare Corp.*, 152 Or App 421, 954 P2d 829 (1998). The Supreme Court agreed and affirmed our decision.

The Supreme Court noted that Grimm had "eliminated other potential causes of [the] plaintiff's conditions through differential diagnosis, which is a generally accepted form of scientific inquiry." *Jennings*, 331 Or at 308. With respect to Grimm's reliance on his experience with other patients, the Supreme Court noted:

> "Any scientist can check Grimm's testing methods and the clinical history of each of his patients. Moreover, Grimm's results also can be tested (another neurologist could test women with silicone breast implants to see if they had the same neurological conditions identified by Grimm). * * *
>
> "* * * * *
>
> "* * * Grimm's hypothesis is based on his own experiences and observations, as well as on scientific methodology. It was tested by his evaluation of about 50 patients, most of whom exhibited 'unique' symptoms and conditions similar to those of plaintiff."

*Id.* at 307-08.

In sum, the Supreme Court analyzed Grimm's previous study and concluded that, because it validly linked silicone to a unique neurological disorder, he had a scientifically valid basis for linking plaintiff's symptoms with silicone. Essentially, Grimm properly "ruled in" silicone as a potential cause of the plaintiff's injury.[9]

---

[9] *See also State v. Sanchez-Cruz*, 177 Or App 332, 33 P3d 1037 (2001). There, an expert medical witness, Dr. Bays, testified regarding her diagnosis of "child sexual abuse" of the victim. *Id.* at 335. Bays testified that, based on her observations of the victim in a physical exam and a verbal case history, the victim showed signs of abuse.

■    The Supreme Court's analysis in *Jennings* very substantially informs our consideration and disposition here. In assessing the admissibility of Williamson's testimony regarding causation, we note, at the outset, three salient features of his opinion.

*First*, Williamson did not purport to identify any scientifically demonstrable mechanism of causation—and, indeed, expressly acknowledged that he was unable to do so. In particular, Williamson did not identify any causal relationship between necrosis and Raynaud's syndrome.

*Second*, Williamson acknowledged that plaintiff's case was singular—that is, literally unique in his experience. To Williamson's knowledge, there had never been any reported incidents of a person experiencing Raynaud's syndrome following extravasation of a contrast chemical. Nor could Williamson identify any arguably analogous case.

That circumstance—that singularity—distinguishes this case from *Jennings*. There, the expert, Grimm, could not explain why or how silicone exposure could have caused the plaintiff's symptoms—just as Williamson here could not explain why or how gadolinium extravasation could have caused plaintiff's Raynaud's syndrome. *See Jennings*, 331 Or at 291 (quoting Grimm's testimony: "What I don't understand is the mechanism yet. That, I'm working on. I cannot say that I have got to that point in my work, that I understand the mechanism."). However, unlike in this case, in *Jennings*, Grimm was able to refer to roughly four dozen other cases of the "unique pattern" of women who had been exposed to silicone migration from ruptured breast implants experiencing neurological disorders. Such corroboration is completely absent in this case.

---

We concluded that Bays's conclusion was based on scientifically valid methods. We relied on the fact that (1) the methods used by Bays, generally, are widely accepted methods of medical diagnosis; (2) "[c]hild sexual abuse" is an "accepted medical diagnosis"; and (3) medical literature "supported [Bays's] reasoning about the implications of the victim's physical condition." *Id.* at 342, 336. That is, in conducting the physical examination and case history of the victim, Bays was able to take notice of signs or symptoms that are consistent with recognized signs and symptoms of the particular diagnosis.

*Third*, as noted, the dispute here is not over the abstract validity of differential diagnosis as a scientifically valid methodology. Rather, defendants challenge Williamson's application of that methodology—and, particularly, Williamson's "ruling in" of gadolinium extravasation as a possible cause of plaintiff's Raynaud's syndrome. The practical significance of that "ruling in" was, of course, that once Williamson, by way of differential diagnosis, eliminated every other potential cause, gadolinium extravasation was, by default, the "last cause standing"—rendering it the "medically probable" cause of plaintiff's condition.

A simple hypothetical approximates defendants' challenge in its most basic form: A, who is experiencing migraine headaches, visits Dr. X, an expert on headaches. In attempting to diagnose the cause of A's headaches, X lists every known cause of migraines and also "rules in" "evil spirits." X then, by way of differential diagnosis, eliminates all the other causes and renders the opinion, "It must be the evil spirits." Notwithstanding X's expertise and ostensible use of differential diagnosis, that opinion would not meet the requirements of foundational admissibility. *See, e.g., Rosen v. Ciba-Geigy Corp.*, 78 F3d 316, 318 (7th Cir 1996) (in performing its "gatekeeper" function, the court must determine "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist").

Of course, Williamson's opinion in this case is not so crude. Nor is defendants' challenge so simple. A series of escalating hypotheticals brings the inquiry into sharper relief:

Case #1: B experiences numbness in her left hand immediately after applying lotion to her foot. Dr. Y renders the opinion, based solely on the temporal relationship, that the lotion must have caused the numbness. Y cannot explain why or how the lotion caused the numbness, and there are no reported cases of lotion causing numbness in hands or elsewhere.

Case #2: The same facts as Case #1, except that B applied the lotion to her left hand immediately before the

onset of numbness in that hand. Y's opinion is based solely on the combination of temporal and spatial proximity.

Case #3: The same facts as Case #2, except that there is one reported study that, when applied to mice in large quantities, the lotion caused skin cancer. Y's opinion is based on the combination of temporal and spatial proximity and on the study involving the mice. Again, Y cannot explain why or how the lotion could cause numbness and, specifically, Y cannot explain why skin cancer, or the mechanisms of causation of skin cancer, are related to numbness in the hand.

The first case is, obviously, the easiest. Y's opinion is based on quintessential *"post hoc ergo propter hoc* (after this, therefore because of this)" reasoning and, as such, would not be admissible as scientifically valid under OEC 104. As the Supreme Court explained in *Jennings*:

> " '[S]ome children who live near power lines develop leukemia; but does exposure to electrical and magnetic fields cause this disease? The anecdotal evidence is not compelling because leukemia also occurs among children who have minimal exposure to such fields. It is necessary to compare disease rates among those who are exposed and those who are not. If exposure causes the disease, the rate should be higher among the exposed, lower among the unexposed.' "

331 Or at 306 (quoting David H. Kaye and David A. Freedman, *Reference Guide on Statistics*, 91, in *Reference Manual on Scientific Evidence* (Federal Judicial Ctr, ed 1994) (original footnote omitted; brackets in *Jennings*)); *see also Moore v. Ashland Chem. Inc.*, 151 F3d 269, 278 (5th Cir 1998) ("In the absence of an established scientific connection between exposure and illness, or [other] compelling circumstances * * * the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation.").

The second case, although seemingly—and perhaps actually—more compelling, is similar to the first. Both involve after-the-fact attribution of causation based on unique factual circumstances that may, or may not, be coincidental. Again, in each case, there are no reported cases of anyone else ever experiencing numbness in the hand or

elsewhere after applying the lotion to the hand or any other part of the body. It may very well be that a prudent person (or physician) might, "to be on the safe side," stop using the lotion.[10] But foundational scientific validity, as prescribed in *Brown* and *O'Key*, requires more.

The third case approximates this case. It partakes not only of temporal and spatial proximity but also of proof that, sometimes, exposure to the substance involved can cause adverse effects. The difficulty, however, is that the adverse effect in nonhuman subjects is not only different from that experienced by the plaintiff, but also that the expert cannot identify any reason how or why that adverse effect could be related to causation of the plaintiff's condition.

Here, again, Williamson, although pointing to necrosis reported in the mouse study as evidence of the toxicity of gadolinium, could not explain why such toxicity should be causally related to the onset of Raynaud's syndrome.

■■ ■■ The question is not easy. Nevertheless we conclude that, even with full appreciation of Williamson's expertise, *Brown* and *O'Key* require more. Either the expert must be able to identify a scientifically demonstrable mechanism of causation or there must be some independent, verifiable corroboration of otherwise inexplicable causation, as in *Jennings*. Where, however, a plaintiff's circumstances are unique and the expert cannot proffer a mechanism of causation, general temporal and spatial proximity to the onset of symptoms, even when coupled with reports of other adverse effects, is insufficient.[11]

---

[10] Indeed, a prudent physician or scientist might attempt to safely replicate the ostensible phenomenon.

[11] It is on this understanding of what *Brown* and *O'Key*, as amplified in *Jennings*, require as an irreducible minimum that we and the dissent respectfully disagree. *See* 215 Or App at 193 (Armstrong, J., dissenting). Although the dissent posits that Williamson's hypothesis can be *"falsified"* in various fashions, *see* 215 Or App at 196 (Armstrong, J., dissenting), that miscasts the inquiry—and, in doing so, impermissibly shifts the burden of establishing admissibility under *Brown* and *O'Key*.

Although "falsifiability" is an essential feature of scientific method, abstract "falsifiability" is not sufficient, by itself, to render a hypothesis admissible scientific evidence under *Brown* and *O'Key*. If it were, any unverified, but objectively *disprovable* hypothesis—*e.g.*, that water boils at 32 degrees Fahrenheit, that consuming chocolate causes pregnancy—would be admissible, and the *opponent* of

The cases that plaintiff invokes are not to the contrary. For example, plaintiff points to *John's Heating Serv. v. Lamb*, 46 P3d 1024 (Alaska 2002), where the court upheld the admission of an expert's testimony that the plaintiff's symptoms had been caused by exposure to carbon monoxide. There, the expert used differential diagnosis "bolstered" by a temporal relationship between exposure and the onset of symptoms. *Id.* at 1036. However, that case is distinguishable in that, although the court noted that temporal relationship, it also noted a variety of other considerations supporting the expert's opinion, including, significantly, published literature showing that the plaintiff's symptoms "correspond[ed] almost uniquely to carbon monoxide poisoning." *Id.* In contrast, here there is no published literature substantiating that plaintiff's symptoms correspond—much less "almost uniquely"—to gadolinium exposure.

*Westberry v. Gislaved Gummi AB*, 178 F3d 257 (4th Cir 1999), is similar. There, the court upheld the admission of scientific evidence based on the testifying expert's reliance on a strong temporal relationship and differential diagnosis. However, there, as in *John's Heating Serv.*, there was no dispute that exposure to the toxin at issue was capable of causing the plaintiff's injury. *Id.* at 264.

We appreciate plaintiff's assertion that "someone has to be the first" and that she should not be unfairly disadvantaged merely because she was "the first." *Accord O'Key*, 321 Or at 293 n 9 (" 'The chief difficulty with novelty as a limitation is * * * that it too strongly suggests a focus upon the subject matter of the testimony as opposed to the real matter of concern, the particular general propositions relied upon by the witness.' ") (quoting John William Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form*, 71 Or L Rev

that "scientific evidence" would then be compelled to persuade the jury, or other trier of fact, that that "falsifiable" hypothesis was, in fact, false.

Such an approach would invert *Brown* and *O'Key*, which place the burden of demonstrating the validity of putative "scientific evidence" on the proponent of such evidence. Here, again, plaintiff failed in that burden because Williamson's hypothesis was unverified, either by way of replication of plaintiff's singular circumstances or otherwise, and because Williamson was unable to identify a scientifically demonstrable mechanism of causation.

349, 367 (1992)). But the legal deficiency in plaintiff's proof is not that she was "the first." Rather, plaintiff's proof of causation is legally deficient because (1) she is "the only"—again, there are no (other) reported cases of Raynaud's syndrome allegedly related to extravasation of a contrast chemical—as that alleged phenomenon has not been replicated; and (2) Williamson, notwithstanding his manifest expertise, was unable to explain why or how plaintiff's condition could result from such exposure.

We thus conclude that the trial court properly excluded Williamson's testimony pertaining to causation of plaintiff's Raynaud's syndrome. By extension, the trial court correctly granted defendants' motion for a directed verdict against plaintiff's medical negligence claim.

We proceed to plaintiff's second assignment of error, which challenges the trial court's allowance of a directed verdict against plaintiff's informed consent claim. Plaintiff contends that "lawful consent for an invasive and potentially dangerous procedure, such as injection of a contrast chemical, cannot be obtained until the patient has been informed of the nature of the procedure, alternatives, if any, and the risks involved." As support for that proposition, plaintiff invokes ORS 677.097.[12]

---

[12] ORS 677.097 provides:

"(1) In order to obtain the informed consent of a patient, a physician or podiatric physician and surgeon shall explain the following:

"(a) In general terms the procedure or treatment to be undertaken;

"(b) That there may be alternative procedures or methods of treatment, if any; and

"(c) That there are risks, if any, to the procedure or treatment.

"(2) After giving the explanation specified in subsection (1) of this section, the physician or podiatric physician and surgeon shall ask the patient if the patient wants a more detailed explanation. If the patient requests further explanation, the physician or podiatric physician and surgeon shall disclose in substantial detail the procedure, the viable alternatives and the material risks unless to do so would be materially detrimental to the patient. In determining that further explanation would be materially detrimental the physician or podiatric physician and surgeon shall give due consideration to the standards of practice of reasonable medical or podiatric practitioners in the same or a similar community under the same or similar circumstances."

The difficulty for plaintiff, however, is that mere failure to comply with ORS 677.097 is not, in and of itself, actionable. Even assuming, without deciding, that one or more of the defendants failed to comply with that statute, plaintiff must also prove that that failure "caused" the alleged injury. *Arena v. Gingrich*, 305 Or 1, 4, 748 P2d 547 (1988) ("The injury must have resulted from the wrongful conduct. The failure properly to obtain the patient's consent 'causes' the alleged harm if after a proper explanation the patient would not have consented to the procedure (unless, of course, the harm would have occurred without the procedure)."). Here, plaintiff did not do so. Because she could not prove that the extravasation of gadolinium caused her Raynaud's syndrome, she cannot prove that she was injured as a result of the procedure—and, thus, that she was injured as the result of any failure to convey information relating to MRI procedures, and the injection of the contrast chemical particularly.

Plaintiff's third and fourth assignments of error challenge the allowance of the directed verdict against her claim for "negligent spoliation of evidence" and the trial court's exclusion of certain portions of Marburger's testimony pertaining to that claim. Marburger, an MRI technologist, testified that the standard of care for MRI technologists requires the technologist to record what contrast is injected, the amount, the location of the injection, and any problems encountered or complaints made by the patient. After reviewing the documents that were a part of the case, Marburger testified that that information was not on record.

Marburger also noted the incomplete incident report on file. When plaintiff's counsel asked Marburger "what sort of damaging information might have been on the second page" of the report, defendants objected on grounds that that testimony would assume facts not in evidence and would be speculative. The court sustained that objection, which is the subject of the fourth assignment of error. In an offer of proof, plaintiff's counsel explained that Marburger would have testified that

"if those documents had been produced and they contained information indicating that the standard of care was not followed, that there was a complaint by the patient at the time

of the injection consistent with an extravasation, that that would have been helpful to her in forming her opinions on the standard of care, and that the absence of those entries and those records for her to review has impaired her ability to form opinions on the nature and extent of negligence of the defendant, and that is what she would have testified."

The parties vehemently dispute whether, or to what extent, a claim for "negligent spoliation" of evidence is cognizable under Oregon law. *Compare Boden v. Ford Motor Co.*, 86 Or App 465, 739 P2d 1067 (1987) (reversing ORCP 21 A(8) dismissal of claim for economic damages, for diminished value of product liability claim, resulting from third party's negligent destruction/"spoliation" of allegedly defective part; concluding that such a claim was cognizable under the foreseeability principles of *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987)) *with Simpkins v. Connor*, 210 Or App 224, 150 P3d 417 (2006) (disavowing *Boden*'s foreseeability-based analysis as a basis for recovery of purely economic damages but reversing ORCP 21 A(8) dismissal of the plaintiff's claim that, because of the defendant's negligence in failing to timely produce certain medical records, violating a statutory duty prescribed under *former* ORS 192.525(2), the plaintiff was deprived of the ability to pursue a medical malpractice or wrongful death claim against the defendant).

We need not, and do not, address the precise contours of a cognizable claim for "negligent spoliation" under Oregon law. That is so because plaintiff here failed to make a *prima facie* showing that defendants' alleged failure to maintain or produce the allegedly "missing" records materially impaired her prosecution of her medical negligence and informed consent claims.

Plaintiff's "negligent spoliation" claim is akin to a legal malpractice claim in that "damages arise from the loss"—or diminution of value "of an underlying claim." *Simpkins*, 210 Or App at 230. As explained above, plaintiff's primary medical negligence and informed consent claims ultimately failed for lack of proof of scientific/medical causation. Plaintiff argues that, if the allegedly absent records had been created or maintained and produced, Williamson might have been provided with the "missing link" that would have

enabled him to identify and persuasively explain the causal relationship between gadolinium extravasation and Raynaud's syndrome. Specifically, plaintiff points to the fact that no records reflect *the amount of gadolinium* used during the procedure.

Plaintiff's claim in that regard fails because Williamson never testified that the amount of gadolinium injected was, or would have been, material to his opinion regarding causation. To the contrary, when cross-examined specifically about the amount used in humans (as compared to the amounts injected in mice), Williamson responded that the amounts of gadolinium discussed in the literature were not material to his opinion. Rather, his theory of causation depended on the duration of time that tissue is exposed to that substance. *See* 215 Or App at 177. In sum, nothing in Williamson's testimony or in plaintiff's case-in-chief established any need to know of the amount of gadolinium injected into plaintiff's hand. Accordingly, on this record, there is no evidence that plaintiff's prosecution of her primary claims was materially impaired by the absence of such information—whether because of affirmative "spoliation" or by any negligent failure to create, maintain, or produce records pertaining to the MRI procedure.[13]

Finally, we reject plaintiff's assignment of error pertaining to exclusion of certain portions of Marburger's putative testimony. As noted, the excluded testimony pertained to the absence of information in the medical records that may have been material to breach of the standard of care in injecting the gadolinium and informed consent. *See* 215 Or App at

---

[13] Plaintiff also refers to the lack of any records relating to

"consent for the procedure, the type of contrast administered, * * * the number of needle sticks, the location of the injection, plaintiff's response to the injection, the plaintiff's warning about the pain, burning, swelling, and filling, or the identity of the technician who injected plaintiff."

Again, however, plaintiff failed to establish through Williamson's testimony, or otherwise, that such information would have been material to medical causation. Further, to the extent that the absence of any of that information may have been material to plaintiff's informed consent claim, the success of that claim in this context is, as noted, ultimately dependent on plaintiff's ability to show that she was, in fact, injured as a result of the MRI procedure. *See* 215 Or App at 189-90. With Williamson's opinion regarding causation excluded, plaintiff's informed consent claim, again, necessarily fails.

190-91. Given plaintiff's failure of proof as to medical causation, any "negligent spoliation" of documents as to those matters did not, ultimately, materially impair plaintiff's prosecution of her medical negligence and informed consent claims. Consequently, the exclusion of Marburger's putative testimony was not error.

Affirmed.

**ARMSTRONG, J.,** concurring in part, dissenting in part.

The majority concludes that the trial court properly excluded plaintiff's proffered expert evidence on medical causation because the evidence did not meet the standard for its admission. I respectfully disagree with that conclusion. Although the question is close, I believe that the evidence was admissible and that the trial court erred in excluding it.

Plaintiff's expert, Dr. Williamson, diagnosed plaintiff as suffering from Raynaud's syndrome in her left hand. Raynaud's syndrome is a condition in which arteries in the hand become unduly constricted when the hand is exposed to cold. There is no dispute that plaintiff established an adequate foundation for Williamson to testify that plaintiff suffers from that condition. The dispute concerns the adequacy of the foundation for Williamson to give his opinion about the cause of the condition in plaintiff's left hand.

Williamson testified that, in his opinion, an extravasation of gadolinium that occurred in plaintiff's left hand during an MRI that she received from defendants was a substantial causal factor in her development of Raynaud's syndrome in her left hand. He identified a number of factors that led him to that conclusion. They were, *first*, the temporal relationship between the extravasation of gadolinium and the development of Raynaud's syndrome in plaintiff's left hand; *second*, that plaintiff had Raynaud's syndrome in only her left hand when most conditions associated with the development of the syndrome cause people to have the syndrome in both hands; *third*, that gadolinium was shown in a study involving mice to be toxic to tissue, that is, to kill tissue, when exposed to tissue outside of blood vessels; and, *fourth*, that tests and studies involving plaintiff had led him to rule out

all known conditions associated with the development of Raynaud's syndrome in people.

It is important to note, as well, that Williamson is a well-regarded member of a medical research team at Oregon Health and Science University that may be the most experienced and knowledgeable team in the world about Raynaud's syndrome and other vasospastic disorders. As a member of that team, he applied scientific knowledge and techniques to reach a scientific conclusion about the causal contribution of the extravasation of gadolinium in plaintiff's left hand to the development of Raynaud's syndrome in that hand.

Nevertheless, the majority concludes that the trial court properly excluded Williamson's testimony about the scientific conclusion that he had reached about the cause of plaintiff's condition because his testimony failed to meet the standard established in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), for the admission of scientific evidence. That standard requires a court to determine whether proffered scientific evidence is based on "scientifically valid" principles, that is, whether the evidence is legitimately scientific, and to exclude evidence that lacks such a basis.

In reaching its conclusion, the majority principally relies on distinctions that it sees between the excluded evidence in this case and the scientific evidence that the Oregon Supreme Court held to be admissible in *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 14 P3d 596 (2000). With respect, the distinctions that the majority sees are not scientifically significant distinctions. Moreover, the majority's focus loses sight of the core feature of science, which is falsifiability. Both the excluded evidence in this case and the evidence that the court held admissible in *Jennings* involve scientific conclusions that can be shown to be false using recognized scientific techniques. The evidence in both cases is equally scientific.

The core distinction—in fact, the only distinction—that the majority sees between the evidence in this case and the evidence in *Jennings* is the basis on which the two experts placed a disputed causal factor into their differential diagnoses of the plaintiffs' conditions. The condition in

*Jennings* was said to be a unique combination of neurological problems involving the inner ear and a loss of sensation in fingers and toes. The plaintiff's expert in *Jennings*, Dr. Grimm, put silicone breast implants into his differential diagnosis as a potential cause of that condition. He did so based on the fact that he had found the same condition in 43 women whom he had examined in his practice who had had silicone breast implants. In other words, he included silicone breast implants in his differential diagnosis as a cause of plaintiff's condition on the basis of 43 cases. Here, in contrast, Williamson put gadolinium extravasation into his differential diagnosis as a cause of Raynaud's syndrome in plaintiff's left hand on the basis of one case, plaintiff's.

In the majority's view, approximately 50 cases in which Grimm found a "unique pattern" of neurological conditions in women with silicone breast implants made it scientifically appropriate for Grimm to include silicone breast implants in his differential diagnosis as a cause of the condition. Because Williamson had only a single case of a person with Raynaud's syndrome that arose in a hand soon after the person had experienced an episode of gadolinium extravasation in the hand, the majority reasons that it was not scientifically appropriate for Williamson to include gadolinium extravasation in his differential diagnosis as a cause of the condition. While the difference in number, 43 cases versus one, seems intuitively significant, it is not scientifically significant.

As the court recognized in *Jennings*, case reports can play an important role in establishing a cause of a condition, but they must be used with caution:

> "An opinion [on causation] drawn from only case reports can be troublesome, because it involves *post hoc, ergo propter hoc* (after this, therefore because of this) reasoning:
>
>> " '[S]ome children who live near power lines develop leukemia; but does exposure to electrical and magnetic fields cause this disease? The anecdotal evidence is not compelling because leukemia also occurs among children who have minimal exposure to such fields. It is necessary to compare disease rates among those who are exposed and those who are not. If exposure causes the

disease, [then] the rate should be higher among the exposed, lower among the unexposed.' "

331 Or at 306 (citation omitted).

" 'However, *case reports are often all that is available on a particular subject* because they usually do not require substantial, if any, funding to accomplish, and human exposure may be rare and difficult to study. Causal attribution based on case studies must be regarded with caution. However, such studies may be carefully considered in light of other information available, including toxicological data.' "

*Id.* (citation omitted; emphasis in original).

The *Jennings* court ultimately concluded that Grimm's reliance on case reports to put silicone breast implants into his differential diagnosis as a cause of the plaintiff's condition was acceptable because the hypothesis that he derived from the reports could be shown to be false:

"Any scientist can check Grimm's testing methods and the clinical history of each of his patients [to determine whether they had the neurological conditions that Grimm identified and had had silicone breast implants]. Moreover, Grimm's results also can be tested (another neurologist could test women with silicone breast implants to see if they had the same neurological conditions identified by Grimm). Grimm's hypothesis is capable of being falsified; that is, evidence may be introduced to disprove his hypothesis. *See O'Key*, 321 Or at 303 (science is based on testing hypotheses to see if they can be falsified)."

*Id.* at 307.

The same scientific principles apply to Williamson's reliance on a case report to put gadolinium extravasation into his differential diagnosis as a cause of plaintiff's condition. Scientists can check Williamson's testing methods and plaintiff's clinical history to determine whether plaintiff suffers from Raynaud's syndrome in only her left hand and whether the condition arose soon after the gadolinium extravasation episode. In fact, on cross-examination during the OEC 104 hearing in this case, one of the defendants sought to establish that plaintiff suffered restricted blood flow in arteries in both of her hands.

Williamson's hypothesis also can be falsified by evidence about the physiological processes by which arteries in the hand constrict or go into vasospasm. According to the record, there currently are various hypotheses about why arteries constrict in the manner that causes Raynaud's syndrome. One hypothesis is "that there is some type of malfunction within the vessel or the vessel wall" of the arteries that causes them to constrict. Another is that interference with the sympathetic and parasympathetic nerves in the hand can cause or contribute to the constriction seen in Raynaud's syndrome. If evidence is developed that establishes that the first hypothesis is correct and the second is not, then that evidence presumably would undermine if not render false the hypothesis that led Williamson to put gadolinium extravasation into his differential diagnosis, because it relied on a study involving the death of tissue *outside* the walls of blood vessels from gadolinium that had been placed outside the vessels. In fact, one of the defendants sought on cross-examination to get Williamson to agree that nerve impairment was no longer considered to be a cause of the type of vasospasm seen in Raynaud's syndrome.

Although it may be less likely that epidemiological evidence could be developed to disprove the hypothesis in this case than it could to disprove the one in *Jennings*, that should not make a difference to the admissibility of the evidence. Grimm's hypothesis was new and untested, which means that there were no extant epidemiological studies or evidence on the causal relationship between silicone breast implants and the neurological conditions that Grimm had identified. Epidemiological evidence could, in theory, be developed to disprove the hypotheses in both cases, which means that the hypotheses meet the "falsifiability" standard that scientific evidence must meet.

As I noted at the outset, and as the majority recognizes, the admissibility question in this case is close. I believe, however, that we must err in favor of admitting scientific evidence that meets the criterion that the relevant scientific community would consider to be valid evidence. I am confident that the disputed scientific evidence in this case

meets that standard and that the trial court erred in excluding it.[1]

Because of my conclusion about the admissibility of Williamson's opinion about the causal contribution of the gadolinium extravasation episode to the development of Raynaud's syndrome in plaintiff's left hand, I also disagree with the majority's decision to affirm the grant of a directed verdict on plaintiff's informed consent claim. I believe that it should be reversed as well. I agree, however, with the majority's disposition of the remaining assignments of error.

---

[1] The majority contends that I fail to recognize that *Brown* and *O'Key* require more than abstract falsifiability in order to satisfy the foundation for admission of scientific evidence. 215 Or App at 189 n 12. The majority misunderstands my position. A court properly can reject a scientific hypothesis that has been established to be false, *e.g.*, that the sun and planets revolve around the earth. However, a court should not reject a hypothesis of a preeminent medical expert that is based on recognized scientific techniques, that is not inconsistent with current scientific knowledge, and that can be falsified. Williamson's opinion about the cause of Raynaud's syndrome in plaintiff's left hand is such a hypothesis.