No. 792            September 4, 2025            229

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*
*v.*

JEFFREY WADE COLEMAN,
*Defendant-Appellant.*

Washington County Circuit Court
22CR45513; A182683

Theodore E. Sims, Judge.

Submitted May 15, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Laura A. Frikert, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Erica L. Herb, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

TOOKEY, P. J.

Affirmed.

Jacquot, J., concurring.

**TOOKEY, P. J.**

In this domestic violence case, defendant appeals a judgment of conviction for attempted second-degree murder, ORS 163.115 (Count 1); attempted second-degree assault, ORS 163.175 (Count 2); strangulation, ORS 163.187 (Count 4); unlawful use of a weapon, ORS 166.220 (Count 5); coercion, ORS 163.275 (Count 7); interference with making a report, ORS 165.572 (Count 8); fourth-degree assault, ORS 163.160 (Count 10); and menacing, ORS 163.190 (Count 13).

On appeal, defendant raises four assignments of error. For the following reasons, we conclude: (1) the trial court did not abuse its discretion when it denied defendant's midtrial request for substitute counsel; (2) the trial court did not err when it denied defendant's motion to exclude testimony from the state's "strangulation expert"; (3) the trial court did not plainly err when it failed to strike the expert's testimony about a 1943 study; and (4) the trial court did not abuse its discretion in overruling an objection to a statement made by the prosecutor during closing argument. We therefore affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Defendant and J lived together in Hillsboro. In September 2022, police were dispatched to their residence when J called 9-1-1. J told the 9-1-1 operator that defendant had taken her phone and that he had attached three belts around her neck and had tried to lift her up and kill her.

At trial, J did not want to testify against defendant. She testified that she called the police because she was angry and that she sustained injuries when she tripped and fell. That testimony conflicted with J's prior statements and with her grand jury testimony.

At the time of the incident, J told a police officer that defendant put belts around her neck, and she stated that defendant said that he was going to hang her up in the closet and watch the life drain out of her face. J told a paramedic that defendant had strangled her with a belt and shoved a remote control into her mouth, but that she was able to force her hand underneath the belt to breathe. At a

hospital, J also told a physician's assistant that defendant had attempted to strangle her by wrapping a belt around her neck.

About a week after the incident, J testified before a grand jury. In her testimony, she said that defendant tried to put a belt around her neck, but she put her hands between the belt and her neck. J said that she begged defendant to stop, that her hands were numb from the pressure, and that defendant had the belt around her neck for about a minute. Defendant testified at trial, and he denied the charges.

Before trial, the state indicated that it intended to call Theresa Muncy, a forensic nurse practitioner and "expert witness in strangulation." Defendant filed a pretrial motion to exclude or limit her testimony. During the trial, and before the expert was scheduled to testify, the trial court heard arguments on the motion. Although the trial court expressed some skepticism about the necessity for the expert testimony, it ruled that Muncy could testify. The expert witness provided information about the physiology of the neck and throat, about the amount of pressure and time it takes to cause injury or death from strangulation, and about the common signs or symptoms of strangulation.

During the trial, defendant made a request for substitute counsel. After conducting an inquiry, the trial court denied the request. At the end of the trial, the jury returned not guilty verdicts on three counts but found defendant guilty of the remaining charges. After merging the verdicts on fourth-degree assault, the trial court sentenced defendant to 90 months in prison for attempted second-degree murder, and to concurrent sentences of 13 months in prison for attempted second-degree assault, strangulation, unlawful use of a weapon, and coercion. Defendant was also sentenced to a concurrent term of six months in jail for interference with making a report, fourth-degree assault, and menacing.

## II.  ANALYSIS

On appeal, defendant raises four assignments of error. We address each of those arguments in turn.

## A.  *Request for Substitute Counsel*

In his first assignment of error, defendant argues that the trial court erred when it denied his midtrial request for substitute counsel. "State and federal constitutional provisions guarantee a defendant in a criminal case the right to the assistance of counsel."[1] *State v. Smith*, 339 Or 515, 526, 123 P3d 261 (2005). We review the denial of a motion for substitute counsel for abuse of discretion. *State v. Daley*, 318 Or App 211, 213, 506 P3d 502, *rev den*, 370 Or 212 (2022).

Here, defendant's overarching complaint was that his trial counsel was ineffective. Defendant complained that trial counsel described his conduct as "heinous" and that she did not cross-examine all of the state's witnesses. In response to those concerns, the trial court explained that his attorney's use of the phrase "heinous crime" during cross-examination had been intended to be sarcastic, and that defendant's counsel may have had legitimate tactical reasons not to cross-examine all of the state's witnesses. That inquiry and explanation was sufficient. *See State v. Langley*, 314 Or 247, 258, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28 (1993) ("A simple loss of confidence or disagreement with counsel's approach to matters of strategy is not cause to substitute one appointed lawyer for another.").

Defendant also complained that his attorney was working on other client matters during the case, and he argues on appeal that the trial court did not adequately address that concern. The trial court pointed out that it could not see defense counsel's computer screen, but that counsel's cross-examination of witnesses had been effective. We cannot say the trial court abused its discretion in failing to investigate the matter further. "[T]he trial court possesses discretion to determine the scope of the inquiry necessitated by a particular complaint." *State v. Olson*, 298 Or App 469, 472, 447 P3d 57 (2019). Although there may be rare circumstances that are "so egregious as to require the

---

[1] Specifically, Article I, section 11, of the Oregon Constitution provides that "[i]n all criminal prosecutions, the accused shall have the right to * * * be heard by himself and counsel."

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

court's immediate attention," the constitutional right to adequate counsel does not impose "an affirmative duty to conduct an inquiry and make a factual assessment in response to a defendant's complaints about appointed counsel." *Smith*, 339 Or at 525, 527 n 4.

In seeking a different result, defendant relies primarily on *State v. Omar*, 321 Or App 403, 516 P3d 747 (2022) (*Omar III*), where we noted that, in *State v. Omar*, 303 Or App 448, 450, 464 P3d 501 (2020) (*Omar I*), *vac'd in part and rem'd*, 369 Or 675, 508 P3d 501 (2022) (*Omar II*), we accepted a state concession that "the court erred when it failed to conduct an adequate inquiry into defendant's complaints about his lawyer." *Omar III*, 321 Or App at 404. But the circumstances in the trial court in *Omar* were meaningfully different than what transpired in this case: In *Omar*, the trial court "did not actually consider or rule on defendant's motion for substitute counsel." *Omar I*, 303 Or App at 452 n 3. Here, the trial court both considered and ruled on defendant's request.

We further note that Oregon's system for post-conviction relief provides "a constitutionally sufficient mechanism for a person convicted of a crime to raise any claim of inadequate counsel and to obtain appropriate relief." *State v. Hernandez-Sanchez*, 339 Or App 532, 543, 569 P3d 673 (2025) (internal quotation marks omitted).

In sum, we discern no abuse of discretion in the trial court's denial of defendant's midtrial request for substitute counsel.

B.   *Testimony of the Strangulation Expert*

In his second assignment of error, defendant argues that the trial court erred when it denied his motion to exclude the testimony of the strangulation expert. Before allowing the expert to testify, the trial court heard arguments from the parties regarding the admissibility of her testimony.

Relying on OEC 401 and OEC 403,[2] defendant argued that the testimony was not relevant because Muncy had not

---

[2] OEC 401 provides that "relevant evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

reviewed J's medical records, and that the testimony would be confusing and misleading because the state was attempting to "scare" the jury, "to have them wringing their hands over the fact that strangulation is so dangerous, and there's this new science, and there's these new exam kits and things like that."

The state responded that the testimony was necessary for two reasons under OEC 702.[3] First, the state intended to educate the jury about physiological facts that were not a matter of common knowledge, including that strangulation can occur by preventing blood flow to the brain as well as by preventing air flow to the lungs. Second, the state intended for Muncy to explain that it does not take much pressure or time for compression of the neck or throat to cause injury or death, which was relevant, according to the state, because defendant was charged in the first two counts with attempted murder and attempted assault, so the state had to prove he took "a substantial step" toward killing or injuring J.

The trial court expressed some skepticism about the necessity for the expert testimony, observing that "they used to kill people by hanging them," and that it was common knowledge "that if you lose blood to the brain and airflow to the lungs, you're going to drop dead." The trial court ultimately ruled that Muncy could testify, "but it's going to be on a pretty short leash."

Muncy testified about the physiology of the neck and throat and about how it takes very little pressure or time to strangle a person to death. Muncy explained that her testimony about measurements of pressure and time derived from a 1943 study that she acknowledged was "not ethical," and the results of which could not be replicated. Muncy also testified about the signs and symptoms of strangulation.

_____

OEC 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[3] OEC 702 provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

On appeal, defendant argues that Muncy's testimony regarding the mechanisms of strangulation was not relevant because strangulation is defined by statute,[4] and the danger of strangulation is a matter of common knowledge. Defendant also argues that the expert's testimony was more prejudicial than probative because it was likely to dissuade the jury from exercising its own independent judgment. *See State v. Southard*, 347 Or 127, 140-41, 218 P3d 104 (2009) (determining that doctor's diagnosis of sexual abuse was of minimal probative value because it "did not tell the jury anything that it was not equally capable of determining," but the risk of prejudice was great because the diagnosis posed the risk that the jury would not make its own credibility determination and would instead defer to the expert).

In the end, we are not persuaded by defendant's second assignment of error. The threshold for determining whether evidence is relevant is low. "Evidence is relevant if it increases or decreases, even slightly, the probability of the existence of any material fact in issue." *State v. Cox*, 337 Or 477, 485, 98 P3d 1103 (2004), *cert den*, 546 US 830 (2005). Here, defendant was charged with attempted second-degree murder and attempted second-degree assault. To prove those charges, the state had to show that defendant intentionally engaged in conduct that constitutes a substantial step toward commission of the crimes of murder and assault. *See* ORS 161.405(1) (defining attempt as intentionally engaging in conduct that constitutes a substantial step toward commission of the crime); ORS 163.115(1) (defining second-degree murder); ORS 163.175(1) (defining second-degree assault). Muncy's expert testimony about the physiology of the neck and throat and the signs or symptoms of strangulation was relevant to show that defendant took a substantial step toward committing those crimes. In addition, it may not be a matter of common knowledge that strangulation can occur by preventing blood flow to the brain as well as by preventing air flow to the lungs and that strangulation can occur even if the airway is not compressed.

---

[4] ORS 163.187(1) provides that a person commits the crime of strangulation if the person "knowingly impedes the normal breathing or circulation of the blood of another person" by applying pressure on the throat, neck, or chest, or by blocking the nose or mouth of another person.

In addition, we conclude that the trial court did not abuse its discretion in its OEC 403 balancing of the probative value of the evidence against the danger of unfair prejudice. "In evaluating a trial court's discretionary ruling under OEC 403, our role is to assess whether the court's decision falls within the range of legally permissible choices." *State v. Gibson*, 299 Or App 582, 589, 451 P3d 259 (2019), *rev den*, 366 Or 691 (2020). Here, the testimony had probative value because it provided the jury with information about how easily and quickly a person can sustain injury or death from strangulation. And, unlike in *Southard*, 347 Or at 140-41, the evidence was not likely to have caused the jury to decide the case on an improper basis because it did not encourage the jury to rely on the expert in place of making its own findings of fact. If the jury believed that defendant had wrapped belts around J's neck and tightened them, then the expert testimony provided the jury with information relevant to its assessment of whether defendant took a substantial step toward causing injury or death. We therefore reject defendant's second assignment of error.

C.   *The Expert's Testimony about the 1943 Study*

In his third assignment, defendant argues that the trial court plainly erred when it failed to strike Muncy's scientific testimony about a 1943 study.[5] According to the expert, that study established that it takes very little pressure or time to cause injury or death by compressing a person's neck. However, Muncy acknowledged that her testimony about measurements of pressure and time was based on a study that was "not ethical." More specifically, she testified that it is "not ethical to run controlled studies anymore on something like this. We do have a study from 1943 where they did place apparatuses around the neck and create pressure there to study how much pressure it would

---

[5] During the trial, defense counsel stated that she had received "a bunch of articles" on which the expert had relied. Defendant's appellate counsel attached one of those articles as an appendix to the opening brief, stating that the articles are not in the record and that she obtained a copy of the 1943 study from defense counsel. Appellate counsel states that we can take judicial notice of the study but does not expressly request that we do so. The state did not address judicial notice. We take judicial notice of the fact that an article from 1943 entitled, "Acute Arrest of Cerebral Circulation in Man," from volume 50 of *Archives of Neurology and Psychiatry* is attached as an appendix to the opening brief. *See* OEC 201(b).

take to occlude those vessels. So we do actually know those numbers."

Muncy explained that it takes very little pressure to compress the jugular vein and the carotid artery. Regarding timing, Muncy testified as follows:

"Same study from the 1940s very diligently studied the different things that will happen at what time frames for these patients that are being deprived of oxygen in their blood—in their blood and then their brain.

"So it takes about 5 to 10 seconds to render someone unconscious. The average is 6.8 seconds, very quick and very minimal pressure needed for that. Once someone loses consciousness, right about 14 seconds, they can start having 'anoxic seizures,' so that's a word for lack of oxygen in the brain. They can have a seizure from that, which can have its own major consequences. At about 15 seconds, the urinary sphincters lose tone, so someone may pee themselves, be incontinent. At 30 seconds, we see fecal or sphincters for fecal matter losing tone, so someone may poop themselves or be incontinent of stool. At about a minute is when the first patient—62 seconds, is when the first patient ceased respiration, so their brain was no longer telling them to breathe. So they were considered dead at that point.

"And then after a couple of minutes—so the range is pretty wide—62 seconds to, I believe, about 156 seconds. That was when the last patient died in that study, and that is when there was no longer the same brain activity."

At trial, defendant did not object to that testimony. On appeal, he argues that Muncy's "testimony about that study was plainly inadmissible under OEC 702 because the study was not scientifically valid." He argues that a study that physically harms people is not one that it would be ethical to replicate and, as a result, it has no scientific validity. Although we agree that the study appears to have been morally repugnant in that it may have involved injuring or killing test subjects, we are not persuaded that the trial court plainly erred in failing to intervene *sua sponte* to strike the expert's testimony.

An error is plain when it is an error of law, the legal point is obvious and not reasonably in dispute, and the

error is apparent on the record without our having to choose among competing inferences. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). If the trial court plainly erred, it is a matter of discretion whether we will correct it. *State v. Gornick*, 340 Or 160, 167, 130 P3d 780 (2006).

Here, we cannot say it is obvious or beyond reasonable dispute that the trial court was required to intervene and strike the expert's testimony when the expert testified about measurements of pressure and time based on a study that was "not ethical." We recognize that trial courts play an important gatekeeping role to ensure that "proffered scientific evidence is sufficiently valid to assist the trier of fact." *State v. O'Key*, 321 Or 285, 301, 306, 899 P2d 663 (1995). But, as explained in more detail below, ethical concerns do not automatically render a scientific conclusion invalid. Here, the 1943 study is not part of the record on appeal and it was not admitted into evidence at trial, so we offer no opinion regarding the scientific validity of the study or its results. The question before us, as framed by defendant, is whether "the trial court plainly erred in allowing the state's expert to testify to the results of that study and to rely on it in communicating her opinions to the jury."

Absent an objection from defense counsel, we conclude that it is not obvious or beyond reasonable dispute that the trial court was required to strike the testimony. First of all, "the universe of circumstances in which a trial court is compelled to act, in the absence of a motion or objection by a party, is extremely limited." *B. A. v. Webb*, 253 Or App 1, 10, 289 P3d 300 (2012), *rev den*, 353 Or 428 (2013) (internal quotation marks omitted). Second, we cannot say the trial court was required to *sua sponte* strike the testimony because ethical concerns do not automatically render the results of a scientific study invalid and therefore inadmissible. For example, in *State v. Perry*, 347 Or 110, 120, 218 P3d 95 (2009), the issue was whether an expert's testimony that some children who have been sexually abused will delay reporting the abuse was scientifically valid. Even though it would be unethical to abuse children to see if they delayed reporting,[6]

---

[6] As the court put it, "[d]ividing children into two groups and then intentionally abusing one of the groups would be a perversion of science of Orwellian proportions." *Perry*, 347 Or 114 n 3.

the court found that the lack of controlled studies was not an absolute bar to the admission of the testimony. *Id.* at 124.

Similarly, in *Southard*, the expert witness relied on a correlation between sexual abuse and sexualized behavior to conclude that a child had been sexually abused. 347 Or at 136. The defendant argued that the "lack of 'falsifiability'" of the studies showing that correlation meant that the studies were not scientifically valid; that is, no studies had been done that eliminated independent variables for the study subjects' sexualized behavior. *Id.* at 138. The court reasoned that ethical considerations counsel against studies that would test for independent variables but concluded that that did not render the studies invalid. *Id.* The court explained, "Where science cannot ethically provide such an indicator, we are required to look more closely at other factors that offset the unavailability of that indicator." *Id.* Considering those other factors, the court concluded that a doctor's diagnosis of sexual abuse possessed sufficient indicia of scientific validity to be admissible. *Id.* at 139. Because some scientific propositions can be scientifically valid even when it would be unethical to test or replicate them, we conclude here that it was not obvious or beyond reasonable dispute that the trial court was required to *sua sponte* strike Muncy's testimony about the 1943 study.[7] We therefore reject defendant's third assignment of error.

D. *The Prosecutor's Statement During Closing Argument*

In his fourth assignment of error, defendant argues that the trial court erred in overruling an objection to a statement made by the prosecutor during closing argument. The prosecutor told the jury,

"We did get information this morning from Theresa Muncy, who is a forensic nurse, and she provides * * *

_____

[7] In *State v. Ortiz*, 343 Or App 37, 47, ___ P3d ___ (2025), we recently held that a trial court plainly erred in admitting scientific testimony about field sobriety tests without requiring the state to lay an adequate foundation and we exercised our discretion to correct the error. In *Ortiz*, we focused on whether we should exercise our discretion to correct the error. *Id.* at 41-47. Here, by contrast, at step one of the plain-error analysis, and relying in particular on our prior assessment in *Perry* and *Southard*, we conclude it is not obvious or beyond reasonable dispute that Muncy's testimony was based on a scientific study that was invalid, even if it was unethical.

information about her experience and training in the area of strangulation and what it means to be strangled. The important points from that is the physiology of *** your body and how quickly and easily *** your blood flow can be occluded to your brain *** [and] that it takes very, very little pressure for that to occur and that *** it does not take that much time, as she described, to ultimately result in physical injury, serious physical injury, and then ultimately death.

"And so the idea is, is that if he is using a belt around her throat, is he taking a substantial step towards causing her death? Thank goodness she did not die. Thank goodness she was able to beg for her life, and eventually, he stopped. *But Ms. Muncy provides information that informs us about how close of a call that was.*"

(Emphasis added.)

Defendant immediately objected and the trial court overruled the objection. On appeal, defendant points out that Muncy did not review J's medical files or offer any opinion about the allegations against defendant. As a result, defendant claims that the prosecutor's statement was improper because it relied on facts not in evidence. We are not persuaded by that argument.[8] Considered in context, the prosecutor did not rely on facts not in evidence; instead, she invited the jury to draw inferences from the evidence that had been presented. The statement was not improper, it did not deny defendant a fair trial, and the trial court did not abuse its discretion in overruling the objection. *State v. Chitwood*, 370 Or 305, 311, 518 P3d 903 (2022); *State v. Davis*, 345 Or 551, 582-83, 201 P3d 185 (2008), *cert den*, 558 US 873 (2009).

Affirmed.

---

[8] On appeal, defendant contends the issue was preserved because he objected, but he acknowledges that he did not provide the legal basis for his objection and requests plain-error review in the event that we conclude the issue was not preserved. In this case, we conclude that the basis for his objection would have been evident to the trial court because, before Muncy testified, the parties clarified that Muncy had not reviewed J's medical records, and that she would not be providing an opinion about the allegations against defendant. *See State v. Villar*, 287 Or App 656, 659, 404 P3d 1095 (2017) (explaining that defendant's general objection preserved the issue he raised on appeal because "the trial court ruled promptly on defendant's objection and did not ask for further specification, suggesting that it was apparent to the trial court that it understood the basis for defendant's objection"). Therefore, his appellate argument was preserved.

**JACQUOT, J.,** concurring.

Given our standards for plain-error review, I agree with the majority that the trial court did not plainly err when it permitted the "strangulation expert" to offer scientific testimony based on a 1943 study that, according to the expert, was "not ethical." Theresa Muncy, the state's strangulation expert, described the 1943 study as follows when asked by defense counsel if people had died as a result of the experiment:

> "people did die in this study. It was conducted by the U.S. government to determine the forces that fighter pilots experience when they are hitting g-force. So they took volunteers from—who were prisoners and mental health patients—that volunteered for the study. So yes, actually, I misspoke. People did die in the study * * * which is why we don't conduct them anymore. * * * It's not ethical."

She testified that an apparatus similar to an air bladder was applied around the test subjects' necks, and "they would blow it up to [a] certain PSI, and then they would watch and get reports from people that did not die on the things that they experienced and how long it took to render them unconscious, if they had seizures, things like that." On redirect examination, Muncy reemphasized the "low PSI that it takes to occlude" blood vessels.

The state cited a need for the evidence to prove that defendant took a "substantial step" toward murder and assault in response to defendant's request for OEC 403 balancing. The trial court expressed skepticism about the need for the testimony, observing that "they used to kill people by hanging them," and that it was "common knowledge that if you lose blood to the brain and airflow to the lungs, you're going to drop dead." Ultimately, the court allowed Muncy to testify "on a short leash." In my view, Muncy's testimony that did not rely on the 1943 study would have been adequate to prove that defendant's action could have brought about the death of the victim.

In addition to due process concerns about an inability to confront a study that cannot be replicated, I write separately to express how troubled I am that the state would rely on a study of that nature to prove any part of its

case. From what the expert said about it, this repugnant study should be left in the past along with those pertaining to lobotomies, eugenics, and related forced sterilizations, which also sometimes relied on the sacrifices of prisoners and mental patients characterized as "volunteers." *See, e.g.*, Marc D. Brown, *State-Sponsored Sterilization: The Dark History of Eugenics in Oregon*, Oregon State Bar Bulletin, Oct 2016, at 24.

Although the trial court heard preliminary arguments from the parties about whether to exclude or limit Muncy's testimony, it was not clear during those arguments that Muncy's testimony about measurements of pressure and time was based on a 1943 study that she described as "not ethical," in that its results derived from methodology that she testified had injured or killed people. Once it became clear that her testimony was based on that study, then defendant should have objected that the state could not establish the scientific validity of the evidence.[1]

Although trial courts rarely have an obligation to intervene *sua sponte*, the trial court performs the vital role of "gatekeeper" with respect to the admissibility of scientific evidence. *State v. O'Key*, 321 Or 285, 301-02, 899 P2d 663 (1995); *Marcum v. Adventist Health System/West*, 345 Or 237, 244, 193 P3d 1 (2008). When the expert explained that her scientific testimony about measurements of pressure and time was based on a study that was "not ethical," which implied that its results could not be replicated or corroborated, then, in my view, the trial court should have screened that "proffered scientific testimony to determine whether it was sufficiently valid, as a matter of science, to legitimately assist the trial of fact ***." *Marcum*, 345 Or at 244; *see State v. Ortiz*, 343 Or App 37, 47, ___ P3d ___ (2025) (trial court plainly erred in admitting scientific evidence without requiring the state to lay the appropriate foundation).

If defendant had objected, then I doubt the state would have been able to lay a sufficient foundation for the

---

[1] In *State v. Wagner*, 319 Or App 399, 407-08, 509 P3d 731, *adh'd to as modified on recons*, 321 Or App 79, 515 P3d 402 (2022), *rev den*, 370 Or 714 (2023), we held that a detective was qualified to offer expert testimony about the physical signs and symptoms of strangulation. But, in *Wagner*, the expert's testimony, unlike Muncy's testimony about measurements of pressure and time, "did not involve complex scientific calculations." *Id.* at 407.

admissibility of the evidence based on the nonexclusive list of factors discussed in *State v. Brown*, 297 Or 404, 417, 687 P2d 751 (1984), and *O'Key*, 321 Or at 299-306. As we more recently explained, a method that cannot be replicated is not reliable and should not be admitted in a criminal case as valid scientific evidence. *State v. Adams*, 340 Or App 661, 666-67, 572 P3d 291 (2025). Nevertheless, in this case, defendant failed to object to the expert's testimony about the results of the 1943 study. Especially when it comes to the admissibility of evidence, trial judges rely heavily on the advocates to flag concerns, and, in the absence of an evidentiary objection, I agree with the majority that it is not beyond reasonable dispute that the trial court should have intervened in this case *sua sponte* to strike the testimony at issue. At the same time, when an expert testifies that the study underlying the testimony is not ethical, then that should be a red flag to trial judges to consider—even in the absence of an objection—whether an OEC 104 hearing is necessary to test the admissibility of the evidence.

I respectfully concur.